# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMERICAN INFRASTRUCTURE, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | NO.  08-2701 |
| | : | |
| ZACHRY CONSTRUCTION CORP., et. al., | : | |
| | : | |
| Defendants. | : | |

**Goldberg, J.**                                                        **December 28, 2010**

## MEMORANDUM OPINION

In this trademark infringement case, Plaintiff, American Infrastructure, Inc. (AI), seeks to

enjoin Defendants, Zachry Construction Corp. (ZCC) and  Zachry American Infrastructure (ZAI),

from using the "Zachry American Infrastructure" mark and logo.[1]   Plaintiff's complaint alleges

trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125, et seq.,[2] and unfair

competition under Pennsylvania common law.  Before the Court are Plaintiff's and Defendants'

---

[1] In its motion for summary judgment, Plaintiff sought equitable relief, in the form of an injunction and an accounting of Defendants' profits, as well as actual damages.  (Pl.'s First Am. Compl. 10-11.)  However, at oral argument, Plaintiff's counsel stated that the only remedy it is now seeking is an injunction enjoining Defendants from using "Zachry American Infrastructure" in the five states in which the Plaintiff claims its footprint is established.  (Oral Arg. Tr. Oct. 27, 2010, 72.)

[2] Specifically Plaintiff is alleging (1)  false designation of origin, false description, and false representation under the Lanham Act,  15 U.S.C. § 1125(a) and (2) infringement of a common law mark under the Lanham Act,  15 U.S.C. § 1125(a).  (First Amended Complaint.)

cross motions for summary judgment.  For the reasons set forth below, Plaintiff's motion will be denied and Defendants' motion will be granted.

## I.     BACKGROUND

Unless specified, the following facts are undisputed.

### A.     American Infrastructure

Plaintiff, American Infrastructure, Inc., is a Delaware corporation with its principal place of business in Worcester, Pennsylvania.  Plaintiff began operating in Pennsylvania in 1939 under the name "Allan A. Myers & Son."   In 1998, Plaintiff changed its trade name to "American Infrastructure," but in Pennsylvania and Delaware, Plaintiff continues to operate under the name "Allan A. Myers, a company of American Infrastructure."  (Defs.' St. of Facts ¶¶ 1, 6, 7, 13.)[3]

In 1998, Plaintiff acquired the Maryland construction business "T.C. Simons."   In 2000, Plaintiff acquired a Virginia business "R.G. Griffith."   In 2003, Plaintiff renamed its Maryland business "American Infrastructure - Maryland" and in 2007 renamed its Virginia business "American Infrastructure - Virginia."  (Defs.' St. of Facts ¶¶ 7, 9-11.)

Today, after the above acquisitions and name changes, Plaintiff is made up of four business units: Allan A. Myers; American Infrastructure - Maryland; American Infrastructure - Virginia; and Independence Construction Materials,[4] all of which conduct business in the Mid-Atlantic region, which includes Pennsylvania, New Jersey, Delaware, Maryland, and Virginia. (Pl.'s Br. Summ. J.

---

[3] Defendants' Statement of Undisputed Facts will be cited to as "Defs.' St. of Facts" and Plaintiff's Statement of Undisputed Facts as "Pl.'s St. of Facts."

[4] This entity originated in 1998 when Plaintiff consolidated its materials divisions.  (Pl.'s Opp. to Defs.' Br. Summ. J. Ex. Q, AI 000220.)

2; Defs.' St. of Facts ¶ 15.)

According to Plaintiff, since 1998 it has used "American Infrastructure" as its service mark and trade name to identify a wide variety of construction services including, construction management, construction planning, and construction of water, wastewater plants, pipelines, roads, highways and bridges. (Pl.'s Br. Summ. J. 2.) Plaintiff claims that it began using the "American Infrastructure" mark in three stylized formats in 2000: (1) "American Infrastructure" plus its icon; (2) "Allan A. Myers, a company of American Infrastructure" and the icon; and (3) "R.G. Griffith, a Company of American Infrastructure" and the icon. (Pl.'s Br. Summ. J. 3.)

Defendant takes issue with Plaintiff's claim that it uses "American Infrastructure" to identify its services, and asserts that Plaintiff uses a variety of names and marks, which are independent, subject to separate trademark applications and differ in appearance. Defendants also argue that Plaintiff is involved in infrastructure construction but has not presented evidence to support its claim that it engages in construction management or planning. (Defs.' Resp. to Pl.'s St. of Facts ¶¶ 1, 10.)

According to Plaintiffs, between 1998 (when the mark was adopted), and 2008, its annual revenues grew from $142 million to almost $485 million, with contracts ranging in value from $250,000 to $170 million. Plaintiff claims to have 1,500 full-time employees and "hundreds of satisfied customers," 40% to 60% of which are government entities. Plaintiff is approximately the 25th largest heavy civil contractor in the country and the 11th largest contractor in the Mid-Atlantic. (Pl.'s Br. Summ. J. 2-3.)

Defendants note that Plaintiff's revenue growth was due, in part, to the acquisition of other companies. Additionally, Defendant alleges that Plaintiff's customer claims are misleading in that its customer list includes vendors, engineers, suppliers and other contacts including law firms, and

there is no evidence that the customers were "satisfied." (Defs.' Resp. to Pl.'s St. of Facts ¶ 2.)

B.   Zachry American Infrastructure and Zachry Construction Company

The Zachry business began in Texas 80 years ago and presently includes over 30 companies that provide a range of goods and services. According to Defendants, ZCC and ZAI are maintained as distinct entities. Both companies are incorporated in Delaware, with their principal places of business in San Antonio, Texas. ZCC is principally engaged in construction services including industrial construction, heavy civil construction and commercial construction, with annual revenues of approximately $400 million. In its marketing activities, ZCC does not use the ZAI mark. (Defs.' Br. Summ. J. 6-7.)

According to Defendants, ZAI was established and began using the "Zachry American Infrastructure" mark in 2005. Defendants assert that ZAI has no construction operations, is not a construction company, and that ZAI was not created to provide revenue streams to ZCC, but rather, to enter a new market involving finance. Defendants state, "ZAI is involved in the financial side of large, privately owned infrastructure projects" in which "ZAI assists with project financing via public-private partnerships (PPP) for road, rail, and utilities, and roadway electronic toll collection services." As of its summary judgment submission, ZIA had only been awarded one contract and had retained ZCC to provide the construction services for that project. (Defs.' Br. Summ. J. 8.)

Defendants further allege that they have not had any development projects in states where Plaintiff operates, and urge that there is no evidence that Plaintiff has lost any business opportunities to, or been in competition with, ZAI. (Defs.' Br. Summ. J. 8.)

Plaintiff counters that contrary to Defendants' assertion that ZAI is involved only in the financial side of infrastructure projects, ZAI's offerings include development, design, construction,

4

ownership, operation and maintenance.  (Pl.'s Resp. to Defs.' St. of Facts ¶ 24.)  Therefore, according to Plaintiff, "[a]lthough Zachry American Infrastructure's precise business model differs somewhat from that of Plaintiff, some of the services offered to the ultimate customer are identical.  To wit, both Plaintiff and Defendants are engaged in the construction of road, highway, bridge and water projects for public entities."  (Pl.'s Br. Summ. J. 6-7) (citing to the ZAI brochure:  "ZAI was formed to pursue concession type infrastructure projects" . . . "We provide a full-service package that encompasses the finance, delivery and operation of transportation infrastructure projects.")

Plaintiff also points out that Defendants' outside counsel was aware of Plaintiff and its mark prior to the decision to proceed with forming ZAI and beginning to trade under the name "Zachry American Infrastructure."  (Pl.'s Br. Summ. J. 6.)

Lastly, while Plaintiff agrees that the mark was established in 2005, it argues that Defendants did not begin to use the "Zachry American Infrastructure" service mark and trade name until a later date.  (Pl.'s Resp. to Defs.' St. of Facts ¶ 30; Pl.'s Br. Summ. J. 5.)

## II.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A party moving for summary judgment has the initial burden of supporting its motion with evidence that would be admissible in a trial.  Id.  If this requirement is satisfied, the burden shifts to the non-moving party to "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  The non-moving party may meet this burden either by submitting evidence that negates an essential element of the moving party's claims, or by demonstrating that the movant's factual evidence is insufficient to establish an essential element of its claims.  Celotex, 477 U.S. at 331.

The non-moving party cannot avert summary judgment with speculation or conclusory allegations such as those found in the pleadings, but rather, must present evidence from which a jury could reasonably find in its favor.  Ridgewood Bd. of Edu. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999).  In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion."  Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1127 (3d Cir. 1995).

Where cross motions for summary judgment have been filed, as is the case here, the following standards apply:

> In cases where the parties filed cross-motions for summary judgment, each side essentially contends that no issue of material fact exists from its perspective. We must, therefore, consider each motion for summary judgment separately. The standards under which we grant or deny summary judgment do no change because cross motions are filed. Each party still bears the initial burden of establishing a lack of genuine issues of material fact. Such contradictory claims do not necessarily guarantee that if one party's motion is rejected, the other party's motion must be granted.

Williams v. Philadelphia Housing Authority, 834 F.Supp. 794, 797 (E.D.Pa. 1993) aff'd 27 F.2d 560 (3d Cir. 1994) (citations omitted).

## III.  APPLICABLE PRECEDENT - TRADEMARK INFRINGEMENT

To prevail on its claim of trademark infringement and unfair competition under the Lanham Act, Plaintiff must establish that (1) its mark is valid and protectable; (2) it owns the mark;[5] and (3) defendant's use of the mark to identify goods or services is likely to cause confusion.  Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc., 269 F.3d 270, 279 (3d Cir. 2001).[6]

Where a mark is federally registered and has become incontestable, validity, protectability and ownership are proven.  Ford Motor Co. v. Summit Motor Prods., Inc., 930 F.2d 277, 291 (3d Cir. 1991) (citing Opticians Ass'n. of America v. Independent Opticians of America, 920 F.2d 187, 192 (3d Cir. 1990)).  Here, Plaintiff's mark is not federally registered, therefore the primary issue before the Court is whether Plaintiff has established that "American Infrastructure" is a valid, legally protectable trademark.

In order to determine validity and protectablility, a court must examine and then place the mark into one of the following four categories: arbitrary or fanciful, suggestive, descriptive, or

---

[5] "With respect to ownership of an unregistered mark, the first party to adopt a mark can assert ownership to it as long as it continuously uses the mark in its commerce."  Ford Motor Co., 930 F.2d at 292 (citing Tally-Ho, Inc. v. Cast Community College District, 889 F.2d 1018, 1022-23 (11th Cir. 1989)).  Plaintiff argues that "[h]aving been the first to adopt and use the AMERICAN INFRASTRUCTURE mark and to use it continuously thereafter, it cannot be disputed that Plaintiff is owner of the mark."  (Pl.'s Br. Summ. J. 15.)  Defendants do not argue this point.

[6] "The Third Circuit test for common law infringement and unfair competition is identical to the test for federal infringement and unfair competition."  World Wrestling Fed'n Entertainment, Inc. v. Big Dog Holdings, Inc., 280 F.Supp. 2d 413, 446 (W.D.Pa. 2003) (citations omitted); see also Haymond v. Lundy, 2000 WL 804432, at *12 (E.D.Pa. June 22, 2000) (citing Guardian Life Insur. Co. of America v. American Guardian Life Assur. Co., 943 F.Supp. 509, 525 (E.D.Pa. 1996) ("The elements of a cause of action for unfair competition under Pennsylvania common law 'are identical to those for a claim under . . . the Lanham Act, with the exception that the goods need not have traveled in interstate commerce . . . .'")).

generic.  E.T. Browne Drug Co. v. Cococare Products, Inc., 538 F.3d 185, 191 (3d. Cir. 2008).

"Arbitrary or fanciful marks use terms that neither describe nor suggest anything about the product, they bear no logical or suggestive relation to the actual characteristics of the goods."  A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 221 (3d Cir. 2000) (citing A.J. Canfield Co., 808 F.2d 291, 296 (3d Cir. 1986)).  Examples of arbitrary marks include "Camel" cigarettes, "Rainbow" bread and "Apple" computers.  Examples of fanciful marks include "Google" search engine and "Xerox" photocopy equipment.  2  J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition §§ 11:8, 11:13 (4th ed. vol. 2, 2010) (hereinafter McCarthy).

Suggestive marks "require consumer 'imagination, thought or perception' to determine what the product is."  A&H Sportswear, 237 F.3d at 221 (citing A.J. Canfield, 808 F.2d at 297).  Examples of suggestive marks include "Sheer Elegance" pantyhose, "Bear" parkas, jackets and boots, and "Coppertone" suntan oil.  McCarthy § 11.72.

Descriptive marks convey "an immediate idea of the ingredients, qualities or characteristics of the goods,"  A&H Sportswear, 237 F.3d at 221 (citing  A.J. Canfield, 808 F.2d at 297), thereby "directly giv[ing] some reasonably accurate or tolerably distinct knowledge of the characteristics of a product [or service]."  AcademyOne, Inc. v. CollegeSource, Inc., 2009 WL 5184491, * 8 (E.D.Pa. Dec. 21, 2009)(quoting McCarthy § 11:19).  Examples of descriptive marks include "After Tan" after sunning lotion and "Vision Center" optical center.  McCarthy § 11.24.

Generic marks function as the "common descriptive name of the product class."  A.J. Canfield, 808 F.2d at 296.  "Cola" is a generic mark.  E.T. Browne, 538 F.3d at 192.

Arbitrary, fanciful or suggestive marks are always protected under the Lanham Act.[7] Descriptive marks are afforded protection only if they have acquired secondary meaning associating the mark with the claimant. McCarthy §11.24. Secondary meaning exists when a trademark "is interpreted by the concerning public to be not only an identification of the product or services, but also a representation of the origin of those products or services." Commerce Nat'l. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000) (citing Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1231 (3d Cir. 1978)).

Lastly, the Lanham Act provides no protection for generic marks or terms "because a first-user of a term 'cannot deprive competing manufacturers of the product of the right to call an article by its name.'" E.T. Browne Drug Co., 538 F.3d at 191 (3d Cir. 2008), (citing A.J. Canfield, 808 F.2d at 297). Indeed, generic marks "are not trademarks at all." A&H Sportswear, 237 F.3d at 221.

## IV. ANALYSIS

Plaintiff urges that its mark is valid and protectable because it is suggestive. Alternatively, Plaintiff asserts the mark is descriptive and has acquired a secondary meaning. Plaintiff further stresses that ZAI is entering its region with the intention of competing for the same contracts, using a confusingly similar mark, which is likely to cause "reverse confusion" in violation of the Lanham Act.

Defendants argue that they too are entitled to summary judgment and contend in the first instance that the mark is not suggestive. Defendants state that although the "American Infrastructure"

---

[7]Arbitrary, fanciful or suggestive marks are commonly referred to as "inherently distinctive." Ford Motor, 930 F.2d at 292 n. 18.

mark may be descriptive, Plaintiff has failed to point to sufficient facts establishing secondary meaning. Defendants further argue that Plaintiff has not shown that the "Zachry American Infrastructure" mark is likely to cause consumer confusion.

A. <u>Is the Mark Suggestive?</u>

Plaintiff first asserts that the "American Infrastructure" mark is suggestive and thus inherently distinctive. In support, Plaintiff posits two arguments. First, Plaintiff relies on an attempted registration of several of Plaintiff's marks with the Patent and Trademark Office (PTO).[8] Plaintiff cites to the PTO's approval of three American Infrastructure applications for publication on the principal register in April of 2009. Plaintiff notes that the approvals did not require disclaimers,[9] nor did they indicate that they were approved on a 2(f) basis pursuant to the Lanham Act, 15 U.S.C.

---

[8] A party seeking to register its mark with the PTO must submit an application, which is reviewed by a PTO examiner. If the examiner determines that the mark is inherently distinctive (e.g., suggestive), it is "published" on the principal register. A mark that is found to be descriptive is generally barred from publication on the principal register pursuant to Section 2(e)(1) of the Lanham Act. Section 2(e)(1), provides that "No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it – Consists of a mark which (1) when used on or in connection with the goods of the applicant is merely descriptive or deceptively misdescriptive of them. . ." 15 U.S.C. § 1052(e)(1). However, Section 2(f) of the Lanham Act allows for publication on the principal register if the applicant can prove that the descriptive mark has acquired distinctiveness, or secondary meaning. <u>Cold War Museum, Inc. v. Cold War Air Museum, Inc.</u>, 586 F.3d 1358 (Fed.Cir. 2009). Section 2(f) provides that "nothing . . . shall prevent the registration of a mark used by the applicant that has become distinctive of the applicant's goods [or services] in commerce." 15 U.S.C. § 1052(f).

Once the examiner decides to publish a mark, any third party which believes it will be harmed by the decision can file an opposition to the publication. If no opposition is filed, or if the opposition is defeated, the mark is registered.

[9] Where all but a portion of a mark is publishable, and ultimately registrable, the Lanham Act may allow for publication of the mark, but requires that the applicant "disclaim" the "unregistrable component" of the mark. 15 U.S.C. § 1056(a).

§ 1052(f), in other words, on the grounds of having acquired secondary meaning. Thus, Plaintiff deduces that because publication was not based on having acquired secondary meaning, the PTO's decision must have been based on the marks having been found suggestive. (Pl.'s Opp. to Defs.' Br. 4) (citing USPTO "Latest Status Info," July 15, 2009, applications numbers 77/976,619, 77/976,963, and 77/976,922).

Plaintiff's second argument that the mark is suggestive is premised on the fact that "American" and "Infrastructure," read individually, can have alternative meanings, thus requiring consumer imagination to determine what the product is. For example, Plaintiff's counsel claimed that "American" can be suggestive of a number of things, including "high quality" and that "Infrastructure may be a bridge, or it may be road, or it may be a sewer line, but there is no such thing as infrastructure services."[10] (Oral Arg. Tr. Oct. 27, 2010, 13-14.)

We do not find either of Plaintiff's arguments that the mark is suggestive to be persuasive. First, we note that we are not bound by the decisions of the PTO. A&H, 237 F.3d at 207. Moreover, it does not take imagination or a "mental leap" to determine that a company named "American Infrastructure" provides services that include "construction management; construction planning; construction of water and wastewater plants; and construction of pipelines, roads, highways and bridges" (Pl.'s Br. Summ. J. 2) in America.[11] While American Infrastructure is a very large company providing numerous services, some of which may not traditionally be deemed "infrastructure" (e.g.,

---

[10] We note that E.T. Browne, 538 F.3d at 195, instructs that evaluation of a mark "requires looking at the mark as a whole, not dissecting it into various parts."

[11] Defendants dispute whether Plaintiff provides construction management or planning services. See infra, p. 3. This factual dispute does not change our analysis.

quarry services), we are satisfied that as a whole, the mark, American Infrastructure, fairly describes Plaintiff's services. We therefore reject Plaintiff's argument that "American Infrastructure" is suggestive.[12]

We further note that at oral argument, Plaintiff's counsel essentially conceded this point stating that: "I'm happy to concede, for purposes of this argument, that [the mark is] descriptive. And in fact we have not appealed [the decision of the Trademark Trial and Appeal Board denying the mark status as suggestive] to the federal circuit, although we could have. We're happy to take our registrations, under the 2(f) exception, to the Lanham Act."[13] (Oral Arg. Tr. 15.) Given all of the above, we conclude that Plaintiff has not pointed to sufficient evidence to create a genuine issue of material fact that the mark is suggestive.

B.    Is the Mark Descriptive?

Plaintiff next argues that if the mark is not suggestive, it is descriptive (and has developed secondary meaning). (Pl.'s Br. Summ. J. 12.) Defendants do not contest that the mark is descriptive. (Defs.' Br. Summ. J. 16.) We agree with the parties assessments on this issue.

---

[12] We acknowledge that in some instances "American" or "Infrastructure" could be capable of "exclusive appropriation." See e.g., American Plan Corp. v. State Loan & Fin. Corp., 150 U.S.P.Q. 767 (3d Cir. 1966) ("American Plan Corporation" was found not to be descriptive for insurance services, therefore appellant had an "exclusive right" to its use without a showing of secondary meaning). However, we do not find that to be the case here.

[13] The Court pressed this point as follows: So for our purposes, if I issue an order and opinion and say that the plaintiff is resting its arguments on the descriptiveness issue and really, while they briefed this distinctive issue, they essentially concede it, am I correct in saying that? Plaintiff's counsel responded: We're - - I believe - - if I understand Your Honor properly, I think so, because what I'm saying is, if the Court were to find that this is a descriptive trademark, that it is then plaintiff's burden to establish that it has distinctiveness or secondary meaning in the marketplace, then absolutely yes. (Oral Arg Tr. 15.)

As previously noted, a "descriptive" mark conveys an immediate idea of the characteristics of the services provided. A&H Sportswear, 237 F.3d at 221. Plaintiff's own website states: "Put simply our name is what we do - American Infrastructure." The record before us also reflects that A. Ross Myers, the Chairman and Chief Executive Officer of AI, acknowledged that he chose the name "American Infrastructure" because the name "says who we are and where we want to be." (Defs.' Br. Summ. J. 16) (citing ENR Article; Myers Dep. at 67-68.) Plaintiff has also acknowledged that it uses the "American Infrastructure" mark to "identify a wide variety of construction services including: construction management; construction planning; construction of water and wastewater plants; and construction of pipelines, roads, highways and bridges." (Pl.'s Br. Summ. J. 2-3.) Based on Plaintiff's description of its services, and considering the plain meaning of the terms at issue,[14] the name "American Infrastructure" provides a "reasonably accurate" description of the services provided. It does not take a "mental leap" to determine what Plaintiff does. Accordingly, we agree with the parties that "American Infrastructure" is descriptive.

C. Has the Mark Acquired Secondary Meaning?

"Secondary meaning is a new and additional meaning that attaches to a word or symbol that is not inherently distinctive." E.T. Browne, 538 F.3d at 199, (quoting McCarthy § 15:1). In order

---

[14] Infrastructure is defined in part as: "1. The underlying foundation or basic framework (as of a system or organization); 2. the permanent installations required for military purposes; 3. the system of private works of a country, state, or region; also: the resources (as personnel, buildings, or equipment) required for an activity." Merriam-Webster's Online Dictionary, "Infrastructure," http://www.merriam-webster.com/dictionary/infrastructure (last visited November 5, 2010.) American is defined as: "Of or relating to America" or "of or relating to the United States or its possessions or original territory." Merriam-Webster's Online Dictionary, "American (adjective)" http://www.merriam-webster.com/dictionary/american?show=1&t= 1286985350 (last visited November 5, 2010).

to establish secondary meaning, a plaintiff must show that "customers associate [the alleged trademark] with a single, albeit anonymous, commercial source." AcademyOne, Inc., 2009 WL 5184491, at *10 (quoting McCarthy § 15:1 at 6).  Secondary meaning must have been established "at the time and place that the defendant began use of the mark."  Commerce Nat'l Ins. Servs., Inc., 214 F.3d at 438 (citing Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1231 (3rd Cir.1978)). The United States Court of Appeals for the Third Circuit has explained secondary meaning as follows:

> Secondary meaning exists when the trademark is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origin. Secondary meaning is generally established through extensive advertising which creates in the mind of consumers an association between different products bearing the same mark. This association suggests that the products originate from a single source. Once a trademark which could not otherwise have exclusive appropriation achieves secondary meaning, competitors can be prevented from using a similar mark. The purpose of this rule is to minimize confusion of the public as to the origin of the product and to avoid diversion of customers misled by a similar mark.

E.T. Browne Drug Co., 538 F.3d at 199 (quoting Scott Paper Co., 589 F.2d at 1228).

The Third Circuit has established a non-exclusive list of factors relevant to the factual determination of whether a term has acquired secondary meaning.   This list includes: (1) extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion.  Commerce Nat'l Ins. Servs., 214 F.3d at 438.

Before examining each of these factors, we review several Third Circuit cases which are

instructive regarding the "secondary meaning" analysis.

In Ford Motor Co., 930 F.2d at 296-97, the court found that plaintiff's mark had acquired secondary meaning. There, plaintiff had created a design consisting of a blurred image of a 1964 Mustang GT, referred to as the "Ghosted GT." Plaintiff included this design on the packaging of repair parts it sold under the name "Autolite" and then "Motorcraft." Defendant, also in the repair parts business, purchased "shift kit" automotive valve body kits from a third party. The shift kits were individually packaged in boxes bearing trade dress that closely resembled the Ghosted GT. Defendant then re-sold the shift kits in the original packaging. The court found that plaintiff had acquired secondary meaning in the Ghosted GT based in part on evidence that included plaintiff's use of the mark for approximately thirty years. During that time period plaintiff had sales of $18 billion and spent $118 million on advertising and marketing, including in trade magazines. Id. at 280-81, 297.

Comparing the two designs, the court found that "both [bore] the blurred blue image of a speeding car; indeed, it appears that the 'Shift Kit' speeding car is no more than a photo-mechanical copy of Ford's Ghosted GT. The only difference occurs at the top of the packaging, where either the trademark 'Shift Kit' and related information or a 'Ford' trademark and the name 'Motorcraft' appears." Id. at 294. Based on these observations, the court held that the extrinsic copying test was also satisfied and that it could be inferred from the close resemblance of the trade dresses at issue that

the defendant had copied the plaintiff's mark.  Id. at 294, 297.[15]

Conversely, in E.T. Browne, 538 F.3d at 189, the Third Circuit found insufficient evidence to establish secondary meaning.  Initially, the District Court granted summary judgment in defendant's favor ruling that the term at issue was generic.  The Third Circuit disagreed, finding that there was a genuine issue of material fact as to whether the mark was generic or descriptive. However, in affirming the District Court's grant of summary judgment, the Third Circuit concluded that even if the mark was descriptive, Plaintiff had nonetheless failed to point to sufficient evidence to create a genuine issue of material fact on the issue of secondary meaning.

In E.T. Browne, the Plaintiff had sought trademark protection over the phrase "Cocoa Butter Formula."  Plaintiff's evidence in support of secondary meaning included: its use and promotion of the term "Cocoa Butter Formula" continuously for 20 years; the substantial amounts of money spent promoting the term; the nature and quality of the advertising in support of the term; the defendant's alleged intent to copy the term; and the increase in the sales of products bearing the term "Cocoa Butter Formula."  Id. at 199.  The Court concluded that this evidence was insufficient to raise a genuine issue of fact on the question of secondary meaning, reasoning that:

> The evidence's core deficiency is that while it shows [plaintiff] used the term "Cocoa Butter Formula" on many occasions over a long period of time, it does not show [plaintiff] succeeded in creating

---

[15] Similarly, in Versa Products Company Inc. v. Bifold Company (Manufacturing) Ltd., 50 F.3d 189, 198 (3d Cir. 1995) the Third Circuit noted that the District Court had found that secondary meaning was established where the plaintiff had used the product mark continuously for 10 years.  Evidence was also presented regarding the strength of the customers' mental associations between the mark and the product.   Further, plaintiff had extensive sales, having sold tens of thousands of its product, and the Court found that it advertised widely.  Most persuasively to the District Court, there was evidence of intentional copying.  Id.  (We note that the District Court case was reversed and remanded on other grounds.)

secondary meaning in the minds of consumers. Although the evidence leaves no doubt that [plaintiff] hoped the term would acquire secondary meaning, nothing shows that it achieved this goal. Jurors would have to make a leap of faith to conclude that the term gained secondary meaning because the record fails to provide meaningful support. A jury could evaluate the quality of the advertising or consider the rise in product sales, but it would have to guess what lasting impression the advertising left in the mind of consumers or what portion of [plaintiff's] revenue growth it caused.

E.T. Browne, 538 F.3d at 199.

The E.T. Browne Court also noted that a plaintiff might establish secondary meaning from evidence of advertising and sales growth by showing, for example, that the term "had appeared for a long period of time in a prevalent advertising campaign" or showing "revenue growth simultaneous with such marketing." Id. at 199-200. However, the court found that the plaintiff had failed to introduce evidence that it had ever used "Cocoa Butter Formula" as a standalone term as it was always connected with "Palmer's" forming "Palmer's Cocoa Butter Formula." Id. at 200. Thus, marketing and sales evidence may have raised an inference that "Palmer's Cocoa Butter Formula" had gained secondary meaning, however, the court concluded that "nothing in the record would allow a jury to evaluate the strength of the term 'Cocoa Butter Formula' independently from the larger term including 'Palmer's.'" Therefore, the marketing and sales evidence did not create a reasonable inference that the phrase had acquired secondary meaning. Id.

Finally, the court found that while survey evidence of consumer awareness of an alleged mark's secondary meaning is not required, "failure to conduct a secondary meaning survey leaves [plaintiff] without evidence of any sort in this case of the secondary meaning of the term 'Cocoa Butter Formula.'" Id. at 201.

With this precedential backdrop, we address the secondary meaning factors.

1. <u>Length of Use</u>[16]

Plaintiff has been using the "American Infrastructure" mark since 1998 and notes that it's use has been continuous. While Defendants acknowledge that Plaintiff first used "American Infrastructure" in 1998, they disagree that the use was continuous, pointing to a variety of evidence establishing that "American Infrastructure" has not been the only name used by Plaintiff to market its services. Defendants note that "American Infrastructure" has been used in combination with other trade names, and that Plaintiff's use of different names and logos weakens any alleged customer association of the mark. (Defs.' Br. Summ. J. 5, 18; Defs.' Resp. 14.) On this point, we agree with Defendants.

Today, Plaintiff's Pennsylvania and Delaware business, which accounts for 35% of overall revenues, is marketed under the trade name "Allan A. Myers." (Allan Ross Myers Dep. 40-41.) The "American Infrastructure" website states: "Still a family business today, the company operates as Allan A. Myers in Pennsylvania and Delaware, and as American Infrastructure in Maryland and Virginia."

At deposition, Plaintiff's 30(b)(6) witness, Joseph Prego, acknowledged that the names "Allan A. Myers" or "Allan A. Myers, a company of American Infrastructure," are used to market services to the outside world and CEO Allan Ross Myers' acknowledged that the company continues to do

---

[16] Plaintiff argues that while ZAI established its mark in 2005, the "undisputed evidence" shows that it did not begin "using" the ZAI mark until 2006 and did not begin to use the mark along the East Coast until 2008 or later. (Pl.'s Br. Summ. J. 13-14.) We note that Plaintiff did not cite to any evidence to support this claim. However, because Defendant did not dispute it, and because we view the facts in the light most favorable to Plaintiff, we will assume that Defendants did not begin to use the ZAI mark in Plaintiff's footprint until 2008. Therefore, Plaintiff must show that it had established secondary meaning in its mark by 2008.

business in Pennsylvania as "Allan A. Myers." (Prego Dep. 14-16; Myers Dep. 40-41). Myers also testified that "American Infrastructure - Maryland," which operated under the trade name "T.C. Simons" until 2003, is accountable for approximately 35% of the companies' revenues; "American Infrastructure - Virginia," which was marketed under "R.G. Griffith" until 2007, is responsible for 20% of revenues; and Independence Construction Materials is responsible for around 10% of revenues. (Myers Dep. 40-41.)

Plaintiff responds that since changing the name of the company in 1998, all of Plaintiff's revenues were earned under "American Infrastructure, Inc." While this may be true, it remains an undisputed fact of record that Plaintiff traded under names other than "American Infrastructure."[17] Thus, while ten years of use is a significant factor, the variety of trade names that Plaintiff has been marketing under weakens its position.[18]

2. Exclusivity of Use

"As a general rule, widespread use of even a distinctive mark may weaken the mark." Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City, 383 F.3d 110, 123 (3d Cir. 2004). Defendants argue third party use of "American Infrastructure" has weakened the mark, and cite to

---

[17] At oral argument, Plaintiff's counsel clearly acknowledged the use of other marks stating: "So yes, we use several different marks, but 'American Infrastructure' is certainly the primary one." (Oral Arg. Tr. 38.)

[18] We note that under § 2(f) of the Lanham Act, proof of substantially exclusive and continuous use of a mark in commerce for five years is prima facie evidence of acquired distinctiveness. Carnivale v. Staub Design, LLC, 700 F.Supp. 2d 660, 665-66 (D.Del. 2010). However, under Third Circuit precedent, length of use alone is not sufficient to establish secondary meaning. See e.g. E.T. Browne, 538 F. 3d at 199 (finding plaintiff had not established secondary meaning where mark had been used continuously for 20 years).

three companies in the United States that are named "American Infrastructure"[19] as well as the thousands of other companies that use the terms "American" or "Infrastructure." (Defs.' Br. Summ. J. 9-10, 19; PA Dept. of State, Corporation listings, "American" & "Infrastructure," Exhibits 23, 24.) Plaintiff responds that none of the companies cited use their name or mark in the Mid-Atlantic region where Plaintiff enjoys common law rights under the Lanham Act, a point un-refuted by Defendants. (Pl.'s Opp. to Defs.' Br. 11.)

### 3. Size of the Company, Number of Sales and Number of Customers

There is a logical inference that "[t]he larger a company and the greater its sales, the greater the number of people who have been exposed to this symbol used as a trademark, and the greater the number of people who may associate this symbol with a company or source with which they should be familiarized." McCarthy § 15:49. As of 2008, Plaintiff was the 25th largest civil contractor in the United States and the 11th largest in the Mid-Atlantic region. Between 1998 and 2008, its revenues grew from approximately $140 million to almost $485 million. (Pl.'s Opp. to Defs.' Br. 12-13.)

Plaintiff claims that it was unable to calculate an exact number of customers served, but estimates that number to be many hundreds if not thousands between 1998 and 2008. (Pl.'s Br. Summ. J. 16.) Plaintiff submitted a "Customer List" to support this assertion, however, as Defendants note, the "Customer List" includes vendors, engineers, suppliers and other contacts including law firms, making it difficult to determine an actual customer number. We also note that Plaintiff has "substantial repeat business." Indeed, Plaintiff's 30(b)(6) witness testified that approximately 50% of private business is repeat business. (Oral Arg. Tr. 52; Prego Dep. 62.)

---

[19] "American Infrastructure, Inc.," a multi-state construction company based in Colorado; "American Infrastructure Technologies, Corp.," based in Alabama; and "American Infrastructure MCF Funds," based in California.

4. <u>Extent of Sales and Advertising Leading to Buyer Association</u>

A plaintiff might prove secondary meaning, without surveys or testimonials, through evidence of advertising and sales growth by establishing that the term had appeared in "a prevalent advertising campaign" or by showing "revenue growth simultaneous with such marketing." <u>E.T. Browne</u>, 538 F.3d at 199-200.

Here, Plaintiff concedes it has not undertaken a "prevalent advertising campaign." Plaintiff explains, however, that it is not the nature of the heavy civil construction industry to expend significant amounts on advertising in support of a mark or service as is routinely done in the commercial products industry. Rather, Plaintiff urges that its services are sold or marketed through group meetings and by responding to requests for proposals. Plaintiff also stresses that since adopting the "American Infrastructure" mark in 1998, it has advertised in the leading trade publications and through its website, and has distributed brochures and semi-annual newsletters to its customer list since 2003. Additionally, Plaintiff notes that there is a logo on all of its vehicles and equipment and "American Infrastructure" signs posted at every job site. (Pl.'s Opp. to Defs.' Br. 9; Oral Arg. Tr. 16.)

Plaintiff contends that despite not having a prevalent advertising campaign which could be used to establish a connection between the mark and growth, such connection can be "inferred" from its revenue growth of approximately $140 million to almost $485 million in the past ten years. However, Plaintiff has presented no evidence to support this inferential contention. Large sales figures and increased revenues "may be due to dozens of factors, only one of which may be the drawing power of the trademark. To make popularity relevant as evidence, causation between the trademark and the popularity must be proved." McCarthy § 15:47. This is especially pertinent here where Plaintiff has acknowledged that some of its revenues and trademark advertising are associated

with names other than "American Infrastructure."

5. Use of Mark in Trade Journals

Plaintiff claims it has advertised in trade journals and has been the subject of articles therein. In 2008, Plaintiff spent approximately $25,000 advertising in three trade journals, ENR, Mid-Atlantic Construction and ARTBA. (Pl.'s Resp. to Defs.' St. of Facts ¶ 74.) Plaintiff has presented evidence of articles and advertisements including advertisements for employment opportunities and its inclusion in the list of top contractors for several years running. (Pl.'s Opp. to Defs.' Br. 12, Ex. P.)

Defendants present several responses. First, they argue that Plaintiff spends only a small amount on advertising in trade journals. Second, Defendants point out that Plaintiff has provided no evidence that relevant customers look at trade journals. Specifically, Defendants assert that Plaintiff has not shown that relevant government and private consumers of construction services subscribe to or read these publications. Citing to the ENR media kit submitted by Plaintiff, Defendants note that the kit suggests that the publication is predominately aimed at contractors who are not typically Plaintiff's customers. (Defs.' Resp. 6-7.) Further, Defendants argue that much of Plaintiff's business is the result of face-to-face meetings, not advertising, and much of the business is repeat business. (Defs.' Br. Summ. J. 19.)

Similar to its general advertising, Plaintiff spends only a fraction of its substantial revenue on advertising in trade journals. In 2008, when Plaintiff's revenue was $485 million, it spent only $25,000 - 30,000 on such advertising, a fraction of its total revenue. We conclude that Plaintiff has not sufficiently demonstrated the effect that advertising in trade journals has had on its customers.

6. Fact of Copying

Plaintiff did not address the intent to copy element of the secondary meaning analysis, but

addresses copying in the context of "confusion." Plaintiff claims that Defendants copied the "American Infrastructure" mark knowing it was already in use. According to Plaintiff, Defendants purposefully manipulated the ZAI mark so as to more closely resemble Plaintiff's well-established marks. (Pl.s' Br. Summ. J. 23-24; Pl.'s Opp. to Defs.' Br. 18-19.)

Defendants respond that there is no evidence of an intent to copy and confuse. They claim that at the time ZAI adopted its name, the only state where the two companies overlapped in business was Virginia, and, at that point, Plaintiff was operating under the name "R.G. Griffith." Defendants allege the name was chosen:

> because of the descriptive nature of each of the three words. . . . the part "Zachry" was important because it provides credibility across a full range of projects and brings the longstanding historic power of the Zachry family name to the entity. "American" was chosen because ZAI Inc. was the only American-based company looking to get into this kind of [public-private partnership] business. "Infrastructure" was selected because it describes the broad kinds of projects that would attract investment interest.

(Defs.' Br. Summ. J. 28-29.)

A defendant's knowledge of a plaintiff's mark prior to adopting its mark is not, on its own, sufficient to find an intent to copy. In E.T. Browne, the defendant's founder testified that "while he may have known about Browne's use of 'Cocoa Butter Formula' when [defendant] began using that term on its own products . . . he decided to use the word 'Formula' because it is a standard descriptor in the cosmetics industry." The court found that the founder never testified that he copied plaintiff's term and nothing in the record suggested that he did. Thus, even viewing the evidence in the light most favorable to the plaintiff, the court could not "discern how a reasonable jury could conclude that [defendant] intended to copy [plaintiff's] use of the term 'Cocoa Butter Formula.'" E.T. Browne,

538 F.3d at 200.  In short, where there is no direct evidence of copying, "no presumption of intentional copying arises where the marks as a whole are not identical."  InterState Net Bank v. NetB@nk, Inc., 348 F.Supp.2d 340, 356 (D.N.J. 2004) (citing Pharmacia Corp. v. Alcon Laboratories, Inc., 201 F.Supp.2d 335, 375 (D.N.J.2002).  Here, although Plaintiff has presented evidence that Defendants knew about "American Infrastructure" prior to selecting its name, that alone in not enough to defeat Defendants' motion.

Having no additional evidence that Defendants purposefully manipulated the ZAI mark to resemble Plaintiff's mark, we also cannot conclude that, looking at the marks side by side, a fact-finder could infer that copying occurred.  The only significant similarity amongst the marks is that they all contain, albeit in different forms, the descriptive phrase American Infrastructure.   The ZAI mark consists of Defendants' logo, which has been federally trademarked since 1980, and the long established company name "Zachry," along with "American Infrastructure."  (Defs.' St. of Facts ¶¶ 118-20.)  All of the letters in "Zachry" are capitalized and at least double the size of "American Infrastructure," which is located underneath the Zachry.   Conversely, the "American Infrastructure" in Plaintiff's mark uses lower case letters and the American is located on top of Infrastructure.  Most significantly, the logos are entirely different, Plaintiff's being a near complete circle and Defendants' being it's trademarked "Z".

     

Comparing ZAI with the "R.G. Griffith" and "Allan A. Myers"  marks, R.G. Griffith and Allan A. Myers are capitalized and are separated from the lower case "American Infrastructure" by

a line and the phrase "a company of."

 

We cannot, as urged by Plaintiff, presume that Defendants purposefully manipulated the ZAI mark because we do not find that the marks are so similar that a jury could infer copying. Given all of the above, the copying factor also favors granting Defendants' motion.

7. Customer Surveys

Plaintiff did not conduct customer surveys. While the Third Circuit has been clear that customer surveys are not required, they are, nonetheless, "the most direct method of demonstrating secondary meaning and the likelihood of confusion." Charles Jacquin et Cie, Inc. v. Destileria, Inc., 921 F.2d 467, 476 (3d Cir. 1990). Plaintiff notes that surveying within the civil construction industry is difficult because the customers purchasing services are primarily government entities. Nonetheless, Plaintiff acknowledges that it could have hired an expert to call the appropriate individuals within the government but did not think it "made sense [or] that it was likely to be successful or particularly helpful to the Court." (Oral Arg. Tr. 22.) Plaintiff also points out that Defendants did not conduct surveys.

We reiterate that it is Plaintiff's burden to set forth sufficient evidence establishing that it acquired secondary meaning.

8. Customer Testimony

Plaintiff did not address this element in its motion for summary judgment. However, in oral argument, Plaintiff noted that there are a number of customer testimonials in the record, which it

claimed are representative of "third-party noticing the mark and seeing that it functions as a trademark." (Oral Arg. Tr. 19-20.) The Court has been presented with five such letters, three of which speak to the work of "American Infrastructure" in Maryland and Virginia, one which addresses "Allan A. Myers/American Infrastructure" and one which address the work of "Allan A. Myers (AAM)" alone. (Pl.'s Opp. to Defs.' Br., Ex. Q.) Defendant presented three additional letters, all of which cited to "Allan A. Myers," without reference to American Infrastructure. (Oral Arg, Defs.' Demonstratives.)

These letters do not provide significant proof that Plaintiff's customers associate its work with the mark. Of the eight letters noted above, four recognize the work of Allan A. Myers without any reference to "American Infrastructure."

### 9. Actual Confusion

In their motions for summary judgment, both parties acknowledge that there has been no actual confusion. (Pl.'s Br. Summ. J. 22-23; Defs.' Br. Summ. J. 17.) Only one person was identified by Plaintiff on the topic of confusion. This individual was contacted and stated that he knew ZAI and AI were different companies. Plaintiff also claims that a third party once asked an AI employee if he was with the Texas or Pennsylvania American Infrastructure. (Def.'s St. of Facts and Resps. ¶¶ 49-52.) This evidence is simply too sparse to establish that Plaintiff has pointed to sufficient evidence to create a genuine issue of fact regarding secondary meaning.

### D. Conclusion - Secondary Meaning

As previously noted, the issue before the Court is whether, examining the factors discussed above, Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether it has acquired secondary meaning. In order to do so, Plaintiff must demonstrate that

customers associate "American Infrastructure" with a single, albeit anonymous, commercial source. AcademyOne, Inc., 2009 WL 5184491, *10 (quoting McCarthy § 15:1). While there is no set rule as to the amount of distinctiveness required to achieve secondary meaning, "the more descriptive the term, the greater the evidentiary burden to establish secondary meaning." McCarthy § 15:28. Here, the mark in question is, in our view, "more descriptive" placing an even greater evidentiary burden on Plaintiff.

Although Plaintiff relies on the findings by the PTO, we repeat that we are not bound by their decisions. A&H, 237 F.3d at 207. While Plaintiff is a large, successful company, there is not sufficient evidence for a fact-finder to consider linking this success to the mark. The record is also devoid of customer surveys or evidence of actual confusion or intent to copy. The only direct evidence presented by Plaintiff of customer association with Plaintiff's mark appears to be customer letters, three of which addressed "American Infrastructure," one "American Infrastructure" and "Allan A. Myers" and the remaining four only "Allan A. Myers." The impression we are left with is one in which customers do not see a "single, albeit anonymous, commercial source" but separate entities.

There is also no evidence of "extensive advertising." We accept, as we are required to do in examining a motion for summary judgment, Plaintiff's assertion that the construction industry does not rely heavily on typical advertising and that Plaintiff did undertake advertising in trade journals. These facts, however, are not sufficient to withstand summary judgment. A favorable inference that the mark's appearance in those journals created customer recognition with the mark can only be established through some correlation between that advertising and increased sales. Here, Plaintiff's evidence of increased sales stands alone. As the court noted in E.T. Browne, 538 F.3d at 189, a jury would "have to guess what lasting impression the advertising left in the mind of consumers."

Significant revenues and sales can occur for a variety of reasons. Here, for example, between 1998 and 2008 Plaintiff acquired numerous entities, resulting in major growth of the company. We therefore find the matter before us to be more similar to <u>E.T. Browne</u> than <u>Ford</u>.

Therefore, while Plaintiff has shown that it used the name over a long period of time, and has been financially successful, it has not succeeded in establishing a genuine issue of material fact as to whether a secondary meaning was created in the minds of consumers. As the record fails to provide meaningful support for secondary meaning, the fact-finder would have to make an impermissible leap of faith to conclude that the term gained such meaning.[20]

---

[20] Plaintiff has also argued that in addition to examining the secondary use factors, we should also look to the PTO's findings as strong support that the mark has acquired secondary meaning. Plaintiff points to one of the PTO examining attorney's statements regarding three Trademark Applications which read, "if applicant does assert a claim of acquired distinctiveness under 2(f), the examining attorney believes that said claim would be acceptable and would place the application in condition for approval for publication on the Principal Register." (Pl.'s Opp. to Defs.' Br. 7-8; USPTO Reconsideration Letters, Aug. 15, 2008, to Trademark Application Numbers 77/044,834, 77/044,836 and 77/044,841.)

During oral argument, Plaintiff informed the Court that it had recently appeared in front of the PTO Trademark Trial and Appeal Board ("TTAB") regarding these applications. The TTAB noted that the examining attorney had accepted that the wording "American Infrastructure" had acquired secondary meaning under Section 2(f). Additionally, Plaintiff submitted the declaration of its CEO, A. Ross Myers, stating that the "American Infrastructure" mark had acquired secondary meaning. The TTAB determined that "on this record, we are satisfied that applicant has made substantially exclusive use of the wording 'AMERICAN INFRASTRUCTURE'" so that it had acquired distinctiveness under Section 2(f). (Oral Arg., Defs.' Demonstratives, USPTO, Trademark Trial & Appeal Board, July 21, 2010, Serial Numbers 77/044,834, 77/044,836 & 77/044,841.)

Plaintiff's counsel acknowledged that the above finding was not binding on the Court. (Oral Arg. Tr. 9.) We also note that the TTAB ruling stated that "[i]n an inter parties proceeding involving a different record, our ruling might be different." (USPTO, Trademark Trial & Appeal Board, July 21, 2010, Serial Numbers 77/044,834, 77/044,836 & 77/044,841.)

# V.    **CONCLUSION**

As explained above, in order to prevail on its claim of trademark infringement and unfair competition under the Lanham Act, Plaintiff must establish that (1) its mark is valid and protectable; (2) it owns the mark; and (3) defendant's use of the mark to identify goods or services is likely to cause confusion.  <u>Checkpoint Systems, Inc</u>, 269 F.3d 270 at 279.  Having considered both motions for summary judgment, because we find that Plaintiff has not pointed to evidence which would create a material issue of fact regarding secondary meaning, it cannot establish validity of the mark.  Thus, we need not undertake any further analysis. Defendant is entitled to summary judgment.

Our Order follows.